1   BRIAN VOGEL, SBN 167493
2   brian@bvogel.com
    THE LAW OFFICES OF BRIAN A. VOGEL, PC
3   770 County Square Drive, Suite 104
    Ventura, CA 93003
4   Telephone: (805) 654-0400
5   Facsimile: (805) 654-0326

6
    Attorney for Plaintiff
7   CHARLES VELASQUEZ, individually and on
    behalf of all others similarly situated.
8

9
               UNITED STATES DISTRICT COURT
10
11             CENTRAL DISTRICT OF CALIFORNIA

12

13   CHARLES VELASQUEZ, an individual  )
    on behalf of himself and all others      )
14   similarly situated,                 )
15                            )
16         Plaintiff,           )
       vs.                       )
17                          )
18   THE COUNTY OF VENTURA, THE     )
    VENTURA COUNTY SHERIFF'S       )
19   DEPARTMENT, VENTURA COUNTY   )
    SHERIFF BOB BROOKS, AN         )
20   INDIVIDUAL, AND DOES 1-10      )
21                          )
        Defendants.        )
22

Case No. CV10-10080 CBM(PWJx)

VELASQUEZ V. COUNTY OF VENTURA CLASS ACTION

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR: (1) PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AGREEMENT; (2) CONDITIONAL CLASS CERTIFICATION FOR PURPOSES OF SETTLEMENT; AND (3) APPROVAL OF CLASS NOTICE AND METHOD FOR DISTRIBUTION OF NOTICE

[Filed concurrently with Memorandum of Points and Authorities; Declaration of Brian A. Vogel, and [Proposed] Order]

Date: October 24, 2011
Time: 11 a.m.
Courtroom: 2

1

TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on October 24, 2011, at 11:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 2 of the United States District Court, Central District of California, located at 312 N. Spring St., Los Angeles, California 90012, before the Honorable Consuelo B. Marshall, Plaintiff Charles Velasquez ("Plaintiff") will and hereby does move the Court for an order pursuant to *Federal Rules of Civil Procedure* Rule 23 for (1) preliminary approval of class action settlement agreement; (2) conditional class certification for purposes of settlement; (3) approval of class notice and method for distribution of notice; and (4) approval of schedule for hearing on final approval.

This Motion is based on the Memorandum of Points and Authorities, the Declaration of Brian A. Vogel and the attached exhibits, both filed concurrently herewith, and other evidence submitted in this action, on all records and pleadings on file in this action, and on such evidence and argument as may be presented at the hearing on this motion.

Dated: September 20, 2011        THE LAW OFFICES OF BRIAN A. VOGEL, PC


By: _____
BRIAN A. VOGEL
Attorney for Plaintiff Charles Velasquez

1  BRIAN VOGEL, SBN 167493
2  brian@bvogel.com
   THE LAW OFFICES OF BRIAN A. VOGEL, PC
3  770 County Square Drive, Suite 104
4  Ventura, CA 93003
   Telephone: (805) 654-0400
5  Facsimile: (805) 654-0326

6
   Attorney for Plaintiff
7  CHARLES VELASQUEZ, individually and on
   behalf of all others similarly situated.
8

9
                UNITED STATES DISTRICT COURT
10
11            CENTRAL DISTRICT OF CALIFORNIA

12  CHARLES VELASQUEZ, an individual )   Case No. CV10-10080 CBM(PWJx)
13  on behalf of himself and all others )
    similarly situated,              )   VELASQUEZ V. COUNTY OF
14                                    )   VENTURA CLASS ACTION
15             Plaintiff,            )
       vs.                          )   PLAINTIFF'S MEMORANDUM OF
16                                    )   POINTS AND AUTHORITIES IN
                                     )   SUPPORT OF MOTION FOR:(1)
17  THE COUNTY OF VENTURA, THE      )   PRELIMINARY APPROVAL OF
    VENTURA COUNTY SHERIFF'S        )   CLASS ACTION SETTLEMENT
18  DEPARTMENT, VENTURA COUNTY      )   AGREEMENT; (2) CONDITIONAL
19  SHERIFF BOB BROOKS, AN          )   CLASS CERTIFICATION FOR
    INDIVIDUAL, AND DOES 1-10       )   PURPOSES OF SETTLEMENT;
20                                    )   AND (3) APPROVAL OF CLASS
21             Defendants.          )   NOTICE AND METHOD FOR
                                     )   DISTRIBUTION OF NOTICE
22  _____
23                                        [Filed concurrently with Notice and
24                                        Motion, Declaration of Brian A. Vogel
                                          and [Proposed] Order]
25
26
27
28

# TABLE OF CONTENTS

                                                                              **Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  STATEMENT OF THE LEGAL ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. FACTUAL AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . 5

     A.   Procedural History and The Parties' Positions . . . . . . . . . . . . . . . . . . 5

     B.   Discovery and Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     C.   Settlement Negotiations and Mediation . . . . . . . . . . . . . . . . . . . . . . 6

IV.  SUMMARY OF THE SETTLEMENT AGREEMENT TERMS . . . . . . . . . . . . 7

     A.   The Settlement Class Defined . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     B.   Injunctive Relief Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     C.   Class Damages Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     D.   Plaintiff Representative Fee and Attorney's Fees Request . . . . . . . . . . . 13

     E.   Methods of Notice, Administration and Payment . . . . . . . . . . . . . . . . 14

V.   THE COURT SHOULD GRANT PRELIMINARY APPROVAL
     OF THE SETTLEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     A.   The Settlement is the Product of Serious, Informed and
          Non-Collusive Negotiation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

     B.   The Settlement Has No "Obvious Deficiencies" and Falls
          Within the Range for Approval . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     C.   The Settlement Does Not Improperly Grant Preferential
          Treatment To Class Representatives or Segments Of the Class . . . . . . . . 27

     D.   The Stage Of The Proceedings Are Sufficiently Advanced

ii

To Permit Preliminary Approval ................................... 28

VI.   CONDITIONAL CERTIFICATION OF THE SETTLEMENT
      CLASS IS PROPER ........................................... 29

      A.    Plaintiff Satisfies the Requirements of Rule 23(a) ................. 29

      B.    Certification Under Rule 23(b)(2) is Appropriate ................. 34

      C.    Certification Under Rule 23(b)(3) is Also Appropriate ............. 35

            1.    Common Issues Predominate ......................... 35

            2.    A Class Action Is Superior to Other Available Means ........ 36

            3.    The Class As Defined is Manageable and Notice Can be
                  Provided ...................................... 37

VII.  THE PROPOSED METHOD OF CLASS NOTICE IS APPROPRIATE ..... 38

VIII. CONCLUSION ............................................... 40

iii

1

## TABLE OF AUTHORITIES

2
**Page(s)**

3

## CASES

4

*Alvarado v. Bratton,*
5   299 Fed.Appx.740, 2008 WL 4833267 (C.A.9 (Cal.)) . . . . . . . . . . . . . . . . . . . . . . . . . 3

6
*Amchem Products, Inc. v. Windsor,*
7   521 U.S. 591, 117 S.Ct. 2231,138 L.Ed.2d 689 (1997) . . . . . . . . . . . . . . . . . . 35

8
*Boone v. City of Phila.,*
9   668 F.Supp.2d 693 (E.D. Pa. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

10
*Bynum v District of Columbia,*
11   Case No. 02 CV:956 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

12
*Califano v. Yamaski,*
13   442 U.S. 682 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

14
*Comer v. Cisneros,*
15   37 F.3d. 775 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

16
*Craft v County of San Bernardino,*
17   Case No. 05 CV:539 (C.D. Cal.) . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

18
*Fairley v. Luman,*
19   281 F.3d 913 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

20
*Gamino v. County of Ventura,*
21   Case No. 02-CV:9785 (C.D. Cal.) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

22
*General Telephone Co. of Southwest v. Falcon,*
23   457 U.S. 147 , 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982) . . . . . . . . . . . . . . . . . . 30

24
*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) . . . . . . . . . . . . . . . . 26, 30, 31, 33, 35
25

26
*Harris v. Palm Springs Alpine Estates, Inc.,*
27   329 F.2d 909 (9th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

28
*Holmes v. Continental Can Co.,*

iv

706 F.2d 1144 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Jordan v. County of Los Angeles,*
669 F.2d 1311 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Lee v. City of Los Angeles,*
250 F.3d 668 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Lerwill v. Inflight Motion Pictures. Inc.,*
582 F.2d 507 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Lightbourn v. County of El Paso, Texas,*
118 F.3d 421(5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Linney v. Cellular Alaska P'ship,*
151 F.3d 1234 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas
Sands, Inc.,*
244 F.3d 1152 (9th Cir.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*McBean v. City of New York,*
233 F.R.D. 377 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re Mego Financial Corp. Securities Litigation,*
213 F.3d 454 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Monell v. City of New York Dept. of Social Services,*
436 U.S. 658, 98 S.Ct. 2018, 56 L. Ed. 2d 611 (1978) . . . . . . . . . . . . . . . . . . . 1

*Multi-Ethnic Immigrant Workers Organizing Network v. City of Los Angeles,*
246 F.R.D. 621 (C.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Officers for Justice v. Civil Service Commission,*
688 F.2d 615 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Pacific Enterprises Securities Litigation,*
47 F.3d 373 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Parra v. Bashas' Inc.,*
536 F.3d 975 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Schwartz v. Harp,*
  108 F.R.D. 279 (C.D. Cal. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Thomas & Thomas Rodmakers Inc. v. Newport Adhesives & Composites, Inc.,*
  209 F.R.D.159 (C.D. Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Valentino v. Carter-Wallace, Inc.,*
  97 F.3d 1227 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*In re Wash. Public Power Supply System Sec. Litig.,*
  720 F. Supp. 1379 (D. Az. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Williams v. County of Los Angeles,*
  Case no. 2:97-CV-0382-CW (C.D. Cal.) . . . . . . . . . . . . . . . . . . . 23, 24

*Zinser v. Accufix Research Inst., Inc.,*
  253 F.3d 1180 (9th Cir.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## STATUTES

4th Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

14th Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*42 U.S.C. § 1983* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*California Civil Code § 52.1* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12

*Fed. R. Civ. P. 23* . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31, 32, 38

## SECONDARY AUTHORITIES

*3 Newberg on Class Actions*, § 3:5 . . . . . . . . . . . . . . . . . . . . . . . . . 29

*3 Newberg on Class Actions*, §8.39 . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Manual for Complex Litigation*, Second §30.44 . . . . . . . . . . . . . . . . . 20

*Manual for Complex Litigation*, Second §41.43 . . . . . . . . . . . . . . . . . 19

*Manual for Complex Litigation*, Third §30.42 . . . . . . . . . . . . . . . . . . 21

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiff Charles Velasquez and Defendants County of Ventura, the Ventura County Sheriff's Office, and Former Ventura County Sheriff Bob Brooks ("the Parties") have reached a settlement in this action and seek preliminary approval of the settlement from the Court.  In this class action, Plaintiff alleged claims for:  (1) Violation of Civil Rights: Unreasonable Seizures and False Imprisonment (42 U.S.C. § 1983/4th and 14th Amendments); (2) Violation of Civil Rights: Deprivation of Liberty (42 U.S.C. § 1983/14th Amendment) (3) *Monell* Claims on the 42 U.S.C. § 1983 claims; (4) False Imprisonment; and (5) California Civil Code § 52.1:  Interference with Exercise of Civil Rights by Unreasonable Detention.  Plaintiff alleged these claims on behalf of a class of "all persons who have been wrongfully arrested pursuant to a warrant for another person and then wrongfully detained and incarcerated as a result of the County of Ventura and the Ventura Sheriff's Department's failure to verify the individuals' identities, during the time period of December 30, 2008 until the present."  (Complaint, ¶ 40)

Although Defendants deny Plaintiff's allegations and do not admit liability, the Parties come before the Court requesting certification of a Rule 23 Class for settlement purposes only and preliminary approval of the settlement.  In reaching this settlement, the Parties exchanged extensive information through formal discovery and informal means, reviewed numerous documents and data, and engaged in many hours of settlement discussion and negotiations, including four days of mediation before respected mediator

Louise LaMothe.  The terms of this settlement are documented in the Parties' Settlement

Agreement and Release ("the Settlement Agreement"), which is attached to the

Declaration of Brian A. Vogel ("Vogel Decl."), Exhibit 1, and is incorporated herein by

reference.

This settlement provides satisfactory relief to the putative class members and

adequately resolves their claims against Defendants.  The settlement further provides for

substantial injunctive relief measures which address and should completely resolve the

problem of mistaken identity incarceration incidents in Ventura County jails.

Consequently, the Parties request that the Court enter an Order granting: (1) Preliminary

Approval of Class Action Settlement Agreement; (2) Conditional Class Certification for

Purposes of Settlement; and (3) Approval of Class Notice and Method for Distribution of

Notice.

## II.  STATEMENT OF THE LEGAL ISSUE

California jailers use an electronic fingerprinting system known as "LiveScan," a

computerized, electronic fingerprinting system.  Generally, when an arrestee is booked

and fingerprinted, the electronic fingerprints are transmitted to the California Department

of Justice ("CDOJ") in order to obtain identifying information including a personal

identification number based upon the fingerprints.  This Criminal Identification Index or

"CII" number is unique to the individual arrestee and is transmitted to the jail in a

document commonly referred to as a "LiveScan return."  The FBI also assigns a unique

"FBI number" to the electronic fingerprints and this number is also contained in the

1  LiveScan return.  Ninth Circuit authority requires incarcerating facilities in California to

2  verify the identity of an individual arrested based upon an arrest warrant by comparing

3  one of the unique personal identification numbers derived from electronic fingerprinting

4  to the corresponding number usually contained in the arrest warrant or the summary of

5  arrest warrant data contained in a teletyped warrant abstract.  *Fairley v. Luman*, 281 F.3d

6  913 (9th Cir.2002), *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) and *Alvarado*

7  *v. Bratton*, 299 Fed.Appx.740, 2008 WL 4833267 (C.A.9 (Cal.)).

8

9

10       Defendants attempted to simplify the required process by inputting the

11  identification numbers obtained from the LiveScan return into the Ventura County

12  Integrated Justice Information System ("VCIJIS").[1]  Ideally, the staff at a California

13  incarcerating facility would compare the CII number taken directly from the LiveScan

14  return to the CII number in the warrant or teletyped warrant abstract.  However, VCSO

15  was entering the CII numbers from the Livescan returns directly into the VCIJIS system.

16  This was an understandable effort to streamline the identification process, but,

17  unfortunately, the shortcut backfired.  In instances involving identity theft, for example,

18  multiple identification numbers were programmed into the identification screens.  VCSO

19  booked inmates based upon the names that they gave either the arresting officer or

20

21

22

23

24  _____

25       [1] The Ventura County Integrated Justice Information System ("VCIJIS") computer

26  system is a computer database which VCSO uses to store and retrieve information on all

27  individuals who are booked and incarcerated in VCSO jail facilities.  VCIJIS also stores the

28  computerized records for the Ventura County Superior Courts.

booking officer.  The identification numbers were being entered into the identification screens of both the identity thief and the innocent person whose identity was being used.  This resulted in the erroneous inclusion of multiple unique identification numbers in the VCIJIS identification screens of both the identity thief and the innocent person whose identity was being used.  Instead of comparing the identification number from the LiveScan return directly to the corresponding number in the warrant or teletyped warrant abstract, the VCSO classification deputies compared the number or numbers in the warrant or teletyped warrant abstract to the (sometimes incorrect) numbers in the VCIJIS identification screens.  In some of the identity theft misidentification cases, one of the numbers in the VCIJIS identification screen matched the corresponding number in the warrant or teletyped warrant abstract, but not the unique identification number of the arrestee contained in the LiveScan return.

The resolution between the parties, embodied in the Settlement Agreement and Exhibits, now mandates that the VCSO in general, and the classification deputies in particular, retain the LiveScan return itself and make a direct comparison between its CII or FBI numbers and the CII or FBI numbers contained in the warrant or teletyped warrant abstract.  (SA, ¶ 36(B), Exh. A)

The new VCSO policy far exceeds the minimum standards required by the Ninth Circuit.  Pursuant to Article 51, an arrested individual who claims not to be the person on the warrant pursuant to which he or she was arrested has the ability to fill-out a complaint form and have it investigated almost immediately after the initial "reception" booking.

4

(SA, ¶ 34, 36(B), Exh. A)  If the individual complaining is found to be misidentified,

VCSO will release the subject, correct the subject's VICIJIS identification screens, give

the subject official documents designed to prevent recurrence of the problem, and inform

the subject how to clear his or her arrest record in court.  (SA, ¶ 34, Exs. A, D, E, F) The

Settlement Agreement itself acknowledges that the equitable (injunctive) resolution goes

far beyond Ninth Circuit minima.  (SA, ¶ 46)

### III.    FACTUAL AND PROCEDURAL BACKGROUND

#### A.    Procedural History and the Parties' Positions.

Plaintiff filed his initial Complaint on December 30, 2010, asserting claims against

Defendants for civil rights violations based upon their policy and practice of failing to

address or prevent the problem of persons being incarcerated in Ventura County Jails

when those persons were not the correct suspects listed in the arrest warrants pursuant to

which they were arrested.  Defendants answered on February 28, 2011.  Defendants

denied liability as to the Plaintiff and the putative class members.  Defendants also

maintained that Plaintiff would not be able to certify the putative class.

#### B.    Discovery and Investigation

Throughout the litigation, Class Counsel engaged in a thorough investigation of

Plaintiff's and the class claims and potential recovery.  (Vogel Decl. ¶¶ 3-9)  Specifically,

Class Counsel propounded written discovery, including three sets of document requests,

served third party document subpoenas on all California counties with a population of

over 100,000, and third party document subpoenas on the Ventura County Superior Court

and the Ventura County Information Systems Department. Class Counsel defended the deposition of the Plaintiff on June 24, 2011 and also attended the deposition of the Plaintiff's wife Sandra Velasquez on July 22, 2011. *Id.* at ¶ 12. Class Counsel also noticed and prepared for the depositions of six individuals involved in Plaintiff's incarceration as well as Defendants' person most knowledgeable.[2] Class Counsel further hired independent contractors who spent a total of 85 hours in the Ventura County Superior Court clerk's office identifying and gathering information about potential class members. Furthermore, Plaintiff filed a Motion to Compel concerning the contentious issue of disclosure of the contact information of the putative class members which was decided in Plaintiff's favor by Magistrate Judge Walsh on June 30, 2011. *Id.* at ¶ 12.

Throughout the discovery phase of the litigation, Defendants provided Plaintiff with significant data, documents and information.

### C.   Settlement Negotiations and Mediation

The Settlement Agreement in this matter is the result of months of arm's length negotiations between qualified and competent counsel. The Parties have engaged in continuous settlement discussions beginning in late April, 2011. On April 28, 2011, Class Counsel met with defense counsel and Defendants' risk management employees to open the negotiations. On May 9, 2011, Defendants served Plaintiff with an F.R.C.P. Rule 68 Offer. Although Plaintiff rejected the offer, the Parties used the Rule 68 Offer as

---

[2] These depositions were scheduled for August 8-10, 2011 but did not occur because the Parties settled the case at mediation. *Id.* at ¶ 3.

6

a roadmap during the remainder of the negotiations and mediation. *Id.* at ¶ 18.  At the outset, VCSO was willing to stipulate to injunctive relief as it had become readily apparent that their procedures were inadequate to prevent mistaken identity incarceration incidents and VCSO intended to remedy the problem. *Id.*

The Parties mediated the case with Louise LaMothe, a preeminent mediator of class actions, for four full days on July 5th and 6th and August 5th and 6th, 2011.  Plaintiff attended all mediation sessions and five of Defendants' agents also attended.  In preparation for the mediation, in addition to information exchange, the Parties submitted detailed mediation briefs and a list of issues in contention.  Class Counsel presented a lengthy powerpoint presentation during the mediation. *Id.* at ¶ 19.  Since the last day of mediation, counsel for the Parties have spent approximately 100 hours in follow-up discussions finalizing the details of the Settlement Agreement, several of which have occurred with Ms. LaMothe participating. *Id.*

## IV.    SUMMARY OF THE SETTLEMENT AGREEMENT TERMS

### A.    The Settlement Class Defined

The Settlement Class is defined as follows:  All persons who spent any amount of time following master or supplemental booking, irrespective of duration, in a jail operated by the Ventura County Sheriff's Office ("VCSO"), based only upon a warrant or warrants intended for another individual, during the period of December 30, 2008 until the date of the full execution of the Settlement Agreement.

An "Identified Class Member" ("ICM") means a person who has been positively

identified as falling within the class definition.  (Settlement Agreement, "SA", ¶¶ 2 and 12)  A "Possible Settlement Class Member" ("PSCM") means a person whom the Parties have identified as potentially falling within the class definition but must still verify his or her class status through looking at the individual's VCIJIS system records.  (SA, ¶ 3)  The Settlement Agreement terms provide that the Parties will use their best efforts to identify all ICMs and validate all PCSM claims.  (SA, ¶¶ 2 and 3).

**B.     Injunctive Relief Provisions**

As a result of this litigation, Defendants have agreed to substantial injunctive relief provisions including significant changes in their policies and procedures which will adequately address claims of mistaken identity incarceration incidents and guard against future incidents.  Most importantly, Defendants have agreed to shift their primary means of identifying suspects at the booking stage from names and aliases to electronic fingerprint identification.  (SA, ¶¶ 34, 36, Exh. A)  Attached to the Settlement Agreement is a copy of VCSO's revised Divisional Policy, Article 51 which now provides that "[a]ll persons booked into the Ventura County jail shall be enrolled into VCIJIS using the Single Print Index (SPI) biometric device."  (SA, ¶ 34, 36(B), Exh. A)  This system insures that each person booked into the jail is assigned one, and only one, unique identification number based upon his or her fingerprints.  *Id.*  VCSO will retain the LiveScan return and compare the unique identification numbers contained in the LiveScan return directly with the corresponding numbers in the warrant or teletyped warrant abstract.  *Id.*  Defendants have also agreed to alter their Warrant Booking

Notification Form A to prominently show individuals' CII and FBI Numbers

(identification numbers based upon fingerprints).  (SA, ¶ 34, Ex. B)

Defendants have further agreed to institute an effective complaint process at the

booking stage, which is set forth in Article 51.  (SA, ¶ 34, 36(B), Exh. A)  Pursuant to

Article 51, an arrested individual who claims not to be the person on the warrant pursuant

to which he or she was arrested will promptly be afforded the opportunity to complete a

complaint form and have it investigated almost immediately after the initial "reception"

booking.  *Id.*  If the individual complaining is found to be misidentified, VCSO will

promptly release the subject and use "ID Clearance" as a newly minted computer release

code created specifically for this situation.  *Id.*  VCSO will further provide the subject

with a "Notice of Warrant Misidentification" on VCSO letterhead, a copy of their Penal

Code 849(b)(1) release form, instructions about how to obtain a judicial clearance, and a

Penal Code 851.8 petition.  *Id.*  VCSO will further document the incident in their records

and retain those records in order to prevent reoccurrence of the mistaken identity arrest.

(SA, ¶ 34, Exs. A, D, E, F)

For those individuals arrested on an out-of-county warrant, VCSO has revised its

Warrant Release Notification Form B to include a check-box which states "WE HAVE

DETERMINED THAT THE INMATE NAMED ABOVE, IN OUR CUSTODY, IS NOT

THE SAME SUBJECT WANTED BY YOUR AGENCY.  PLEASE UPDATE YOUR

RECORDS ACCORDINGLY," and has agreed to notify the warrant issuing agencies of

mistaken identity incarceration incidents using this form.   (SA, ¶ 34, Exs. A, C)  All of

9

the above forms shall be provided to subjects in both Spanish and English. (SA, ¶ 35)
The choice and content of all the forms related to Article 51, as well as the language of
Article 51, were thoroughly discussed and negotiated between the Parties. (Vogel Decl. ¶
21)

In addition to the above, in an effort to track mistaken identity incarceration
incidents and prevent the recurrence of such incidents with the same individuals,
Defendants have agreed that VCSO will create a new booking disposition code which
will capture those individuals who are identified as being subject to a misidentification
situation and will enter a unique booking disposition code into the VCIJIS system. (SA, ¶
36(C)). Defendants have further agreed that the VCSO training bureau shall develop and
disseminate to county and allied police agencies within Ventura County an informational
training bulletin which will familiarize officers in the field with the problem of mistaken
identity arrests and provide clearance notification form samples so the officers will
recognize them. (SA, ¶ 36 (D))

Furthermore, Defendants have agreed that VCSO shall make continuing efforts to
verify the integrity of the data maintained in the VCIJIS system. (SA, ¶ 36 (A))   It will
remove duplicative or erroneous information in individual computer files, which may lead
to future mistaken identity incarceration incidents, giving priority to individuals currently
in custody. *Id.* Defendants have agreed that within 20 months of final approval of the
settlement, VCSO shall have completed the review and correction of the VCIJIS records
for individuals identified through discovery who potentially have corrupted VCIJIS files.

*Id.* The complaint procedure, the ongoing use of the "ID clearance" disposition code, and use of the SPI system will further insure data integrity in the future. *Id.* Further, VCSO shall retain paper files demonstrating the before and after screen prints for all corrected VCIJIS records for at least six months after the filing of the monitor's final report. *Id.* (SA, ¶ 36 (A))

Finally, the Parties have agreed to terms which will allow for the injunctive relief measures to continue well into the future and makes VCSO accountable for continuing these and future, comparable measures. Specifically, Defendants have agreed: (1) VCSO will periodically review Article 51 in light of advances in identification technology and will revise the policy as identification technology improves, and any future revisions shall be made with the goal of properly identifying arrestees at the earliest possible point in the booking process with the best, reasonably accessible technology; (2) VCSO shall continually maintain a policy in which fingerprint identification be used as the primary source of identification to verify the identity of arrestees who are booked on warrants unless and until another, more reliable, means of identification becomes available; and (3) VCSO shall maintain a mistaken identity procedure approximately commensurate with the provisions set forth in Article 51. (SA, ¶ 36 (E))

The Parties have agreed that a monitor will be appointed to review compliance with all of the injunctive relief measures set forth above after 6 months and again after 24 months after the execution of the Settlement Agreement and will prepare reports on the status of the measures. (SA, ¶¶ 37-43) Furthermore, for 30 months following Final

11

1   Approval of the Class Settlement, Class Counsel may move the Court to enforce

2   compliance with the agreed upon injunctive relief measures and will be entitled to

3   attorney's fees and costs in connection with a successful or partially successful motion to

4   enforce those terms.  (SA, ¶ 44)  The Parties have agreed and request that the Court retain

5   jurisdiction for those 30 months to enforce the specific provisions of the Settlement

6   Agreement and to hear and adjudicate any dispute or litigation arising from the

7   interpretation or application of the Settlement Agreement.  (SA, ¶ 45)

8

9

10  **C.    Class Damages Provisions**

11         The class settlement fund shall be a total of $120,000 to be distributed as follows:

12  $3,000 payment for each "Incarceration Incident" on a claims-made basis with a total

13  settlement fund of $120,000.  The per putative amount selected is within statutory

14  guidelines.  For example, California Penal Code section 4904 establishes a $100 per day

15  reimbursement amount for wrongful incarceration.  California Civil Code section 52.1

16  refers to $4,000 per constitutional violation.  Penal Code section 4030 requires $1,000 for

17  a wrongful strip search.  The average of these values is $1,700.  Here, each ICM shall

18  recover approximately double this average figure for each incarceration incident.  If the

19  Incarceration Incident claims exceed 40, the total settlement fund shall be distributed on a

20  pro-rata basis per incident, irrespective of incarceration duration, not to exceed $120,000.

21  If the incident claims are fewer than 40, the balance of the class settlement fund will

22

23  automatically revert to the County of Ventura.  (SA, ¶ 47(B))  The County will issue 1099

24

25  tax forms as required.  (SA, ¶ 47(B))  Any ICM may claim for multiple Incarceration

26

27

28

12

Incidents during the temporal limits of the class, December 30, 2008 until the date of the full execution of the Settlement Agreement.  (SA, ¶ 4(B))  Thus, an ICM who was booked twice during the temporal limits of the class will receive $6,000.   "Incarceration Incident" means any amount of time following master or supplemental booking, irrespective of duration, spent in the Ventura County Jail System based only upon an arrest for a warrant or warrants intended for another individual made during the temporal limits of the class, December 30, 2008 until the date of the full execution of the Settlement Agreement.  (SA, ¶ 4)

The Claims Administrator ("Administrator") shall deduct from any claim payment amounts owed by a claim participant for any liens or court orders for restitution, child support, debts to county agencies and statutory liens.  (SA, ¶ 62)  The Administrator will make payment to the County or any of its agencies, the proper payee and/or their designee for those payment amounts deducted as set forth in this paragraph.  Despite the amount of any lien, no claimant shall have to pay more than 50% of his/her class fund payment towards the lien, which ensures that the claimant will receive funds for his/her claim regardless of the amount of any lien.  (SA, ¶ 62 (C))

### D.    Plaintiff Representative Fee and Attorney's Fees Request

The Plaintiff Representative shall receive a one-time only lump sum total payment of $55,000.  This figure is comprised of four components as follows:

1. $ 3,000 in general (non-economic) damages for emotional distress.

2. $12,000 in reimbursement is for attorney fees and costs incurred in litigating

Penal Code section 851.8 petitions for factual findings of innocence and judicial

clearance orders in Los Angeles and Santa Barbara Counties.

　　　3. $20,000 is for his past and future medical and psychiatric treatment.

　　　4. $20,000 is for his role as Plaintiff representative.

Mr. Velasquez will not receive any money from the class settlement fund.  (SA, ¶ 47 (A))

Defendants have agreed to pay attorneys' fees and costs to Class Counsel in the amount

of $175,000, subject to the approval of the Court.  (SA, ¶ 47 (A))  Plaintiff's counsel will

file a petition requesting that the Court approve these fees pursuant to Federal Rule of

Civil Procedure 23(h) concurrently with the filing of the Motion for Final Approval of the

class settlement.

　　E.　　Methods of Notice, Administration and Payment

　　　　The Parties have agreed upon procedures by which the Class will be provided with

written notice of the Settlement similar to that approved and utilized in hundreds of class

action settlements.  The Parties have jointly drafted a Potential Settlement Class Member

Letter (SA ¶ 34, Ex O), Notice of Class Action, Proposed Class Settlement and Hearing

("Notice") (SA ¶ 34, Exs. I and J), a Proof of Claim and Release Form (SA ¶ 34, Ex. N),

and an Opt-Out Form (SA ¶ 34, Ex. P).  These documents are collectively called the

"Notice Packet" and will be made available in both English and Spanish.  The Parties

have agreed that the Administrator shall be the County of Ventura, and Defendants will

pay for all costs associated with the Claims Administration of the Settlement.  (SA, ¶¶

1 and 49(C))

14

The Administrator will mail individual Notice Packets to PCSMs and ICMs via first-class regular U.S. mail to the last known addresses taken from the individuals' booking records, unless Class Counsel provides an alternative address within 10 days of the Bar Date. (SA, ¶ 49)  The Administrator will mail individual Notice Packets to PCSMs and ICMs within 30 days after the "Settlement Agreement Database" is completed, and no more than 120 days after preliminary approval of the settlement. (SA, ¶ 5(C))  The Administrator will complete the mailing within three consecutive business days. (SA, ¶ 50)  In addition, the Administrator shall provide Class Counsel with Notice Packets to copy and provide to persons seeking claim forms directly from him.  (SA, ¶ 49)

The Parties have agreed that the individuals who will receive Notice Packets from the Administrator shall primarily be those included in the Settlement Agreement Database ("SAD") which shall be provided to the Administrator 30 days prior to the mailing of the Notice Packets. (SA, ¶ 5)  The SAD shall include (1) individuals who have contacted Class Counsel and whom Class Counsel believes to be PSCMs; (2) individuals derived from Class Counsel's discovery from third party subpoenas to the Ventura County Superior Court after review of the list by VCSO; and (3) individuals who were booked into a VCSO jail on an out-of-county warrant and then transferred from the custody of VCSO to the custody of another California County which issued the warrant which have been ascertained by Class Counsel to be a PSCM. (SA, ¶ 5(A)) The SAD shall consist of, to the extent practicable, the name, address at time of booking, date of birth, date(s) of arrest and the case number(s) of the ICM arrested during the Class Period and booked at a

15

VCSO jail facility.  (SA, ¶ 5(B))

In addition to mailing the Notice Packets, the Administrator will publish Class Notice as follows: **Television:** The Parties will mutually agree upon one Spanish and one English language television ("TV") station to broadcast class notice for 14 consecutive days including Saturdays and Sundays at least five times per day.  (SA, ¶ 51 (A)).  **Radio:** The Parties will mutually agree upon one Spanish and one English language radio station reaching Ventura County to broadcast class notice for approximately ten minutes daily, at least five times per day, for a 14 day period.  If it does not have an in-county broadcast tower, such station must be a 50,000 watt clear channel station.  The content of the television and radio broadcasts are set forth in Exhibits K and L to the Settlement Agreement.  (SA, ¶ 51 (B)).  **Newspaper:** Defendants will place a class notice in the *Ventura Reporter* which will run for two consecutive weeks and shall be at least 1/8 page in size.  The content of this notice is set forth in Exhibit M to the Settlement Agreement.  (SA, ¶ 51 (C)).  **Internet:**  Defendants shall create and maintain a website which will provide notice of and information regarding the lawsuit and settlement, contact information for Class Counsel and the Administrator, and a copy of the Settlement Agreement with the attachments.  No claims shall be presented via the website.  (SA, ¶ 51 (D)).

The Notice shall state that ICMs who wish to participate in the Settlement shall complete and return the Proof of Claim and Release Form  pursuant to the instructions contained therein by mail by the "Bar Date," which is 120 days after the first day that the

16

Administrator mails the Notice Packets.  (SA, ¶¶ 7 and 50, 53, Exs. I and J).  The Notice

shall also provide that any Class Member may choose to opt-out of the Settlement, and

that any such person who chooses to opt-out of the Settlement will not be entitled to any

recovery obtained by way of the Settlement, will not be bound by the Settlement nor have

any right to object, appeal or comment thereon.  (SA, ¶¶ 8, 65, 66)  The Notice will

further provide that to Opt-Out of the Settlement, an ICM must mail the opt-out Form to

the Administrator by the Bar Date.  (SA, ¶¶ 63 and 66, Exs. I, J and P) After twelve

putatives opt out, Defendants may, but need not, unilaterally abrogate the Settlement

Agreement.  (SA, ¶ 67)

Any ICM who does not opt-out as set forth in the Settlement Agreement shall be

deemed conclusively to have become an ICM and to be bound by the Settlement

Agreement and all subsequent proceedings, orders and judgments herein.  (SA, ¶ 65)  The

Notice will further provide that all objections to the Settlement by anyone, including

members of the Class, must be filed in the District Court and served upon all counsel of

record by no later than the Bar Date.  (SA, ¶ 8 and Exs. I and J)

The Administrator shall be responsible for providing and receiving Proof of Claim

Forms.  The Administrator shall further determine eligibility for and the amount of

payment based on the terms of the Settlement Agreement subject to the review of Class

Counsel.  The Administrator shall preliminarily reject any Proof of Claim Forms which

do not meet the requirements set forth in the Settlement Agreement or is otherwise

determined to be deficient.  (SA, ¶ 54)  If the Administrator rejects a claim, it shall

17

provide written notice by First Class Mail to the Claimant and to Class Counsel. The Claimant shall have 30 calendar days from the date of the rejection letter to submit additional information in support of his or her eligibility as an ICM. (SA, ¶ 55) Failure to timely respond to the Administrator's notice of rejection will bar any further rights for consideration of eligibility. *Id.*

If the Claimant timely provides additional information following the Administrator's notice of rejection, the Administrator shall reevaluate the claim. (SA, ¶ 56) If the Administrator reverses the rejection, the Claimant shall be deemed to be an ICM. *Id.* If the Administrator rejects the claim again, it shall provide written notice by First Class Mail to the Claimant and to Class Counsel. *Id.* The Administrator shall also provide any additional information provided by the Claimant to Class Counsel. If Class Counsel and the Administrator cannot agree, the matter shall be submitted to the agreed-upon Special Master, Louise A. LaMothe. *Id.* The Administrator will prepare a list of all claims and their disposition within 30 days following expiration of the Bar Date and provide it to Class Counsel. Claimants who timely submit claims within 30 of the days of the Bar Date whose claims had been primarily rejected by the Administrator shall be allowed to avail themselves of the reevaluation process. (SA, ¶ 57) The Administrator shall reject all Proof of Claim Forms which are not submitted before the Bar Date and no payment shall be made. (SA, ¶ 58)

The Administrator shall make the payments to the verified Claimants, the Plaintiff representative, and to Class Counsel (subject to Court approval) within 45 days of the

18

"Effective Date." This is defined as the date upon which a judgment entered by the Court approving the Settlement Agreement becomes final. The Judgment will be deemed final only upon expiration of the time to appeal without an appeal being filed, or, if a Notice of Appeal is filed, upon exhaustion of all appeals and petitions for writs of certiorari and issuance of mandate. (SA, ¶¶ 14, 60(A) and (B) and 61)  Payments under the Settlement Agreement to ICMs as to whom there was a dispute which resolves in the ICM's favor, shall be made within 30 calendar days of the resolution of the dispute. (SA, ¶ 60(C))

This Notice method was designed to meaningfully reach the largest possible number of Class Members. The mailing and distribution of the Notice satisfies the requirements of due process and is the best notice practicable under the circumstances and constitutes due and sufficient notice to all persons entitled thereto. This notice satisfies the content requirements for notice following the exemplar class notice in the *Manual for Complex Litigation*, Second §41.43, and fulfills the requirement that Class notices be neutral. *Newberg*, §8.39.

## V. THE COURT SHOULD GRANT PRELIMINARY APPROVAL
## OF THE SETTLEMENT AGREEMENT.

In determining whether a class action settlement should be approved under F.R.C.P. Rule 23(e), "the universally applied standard is whether the settlement is fundamentally fair, adequate and reasonable." *Officers for Justice v. Civil Service Commission*, 688 F.2d 615, 625 (9th Cir. 1982). The courts recognize that, "[t]he very essence of a settlement is compromise, a yielding of absolutes and an abandoning of

highest hopes." *Id.* at 624. "The expense and possible duration of the litigation should be considered in evaluating the reasonableness of [a] settlement. See *In re Mego Financial Corp. Securities Litigation*, 213 F.3d 454, 458 (9th Cir. 2000).  If the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval, then the court should direct that notice be given to the class members of a formal fairness hearing, at which evidence may be presented in support of and in opposition to the settlement. *Manual of Complex Litigation*, Second §30.44.

Based upon Class Counsel's own independent investigation and evaluation of the matter after meaningful discovery and negotiations, Class Counsel is of the opinion that the settlement with Defendants for the consideration and on the terms set forth in the Settlement Agreement is fair, reasonable, and adequate and is in the best interests of the class in light of all known facts and circumstances.  Class Counsel recognizes that continuing to litigate and trying this Action against Defendants through possible appeals could take several years and could be at great expense.  Class Counsel has also taken into account the uncertain outcome and risk of litigation, especially in complex actions such as this Action.  Class Counsel is mindful of and recognizes the inherent problems of proof relating to the claims and the alleged defenses asserted in the Action.  Defendants and defense counsel also agree that the settlement is fair and in the best interests of the putative class members, and as such, do not oppose this motion.  (Vogel Decl., ¶ 22)

20

A.   The Settlement is the Product of Serious, Informed and Non-Collusive
Negotiations.

The Ninth Circuit has recognized that "[p]arties represented by competent counsel
are better positioned than courts to produce a settlement that fairly reflects each party's
expected outcome in litigation." *In re Pacific Enterprises Securities Litigation*, 47 F.3d
373, 378 (9th Cir. 1995).  Class settlements reached in arms-length negotiations between
experienced, capable counsel after meaningful discovery are presumed correct. *Manual
for Complex Litigation*, Third §30.42.  The Settlement is the result of extensive and hard-
fought negotiations, after meaningful discovery, with capable advocacy on both sides.
(Vogel Decl., ¶¶ 3 and 18).  Defendants have asserted and continue to assert many
defenses to the claims in this action and have expressly denied and continue to deny any
wrongdoing or legal liability arising out of the conduct alleged in the action.
Nonetheless, Defendants have concluded that this action be settled in the manner and
upon the terms and conditions set forth in the Settlement Agreement in order to avoid the
expense, inconvenience, and burden of further legal proceedings, and the uncertainties of
trial and appeals.

As described above, throughout the litigation, Class Counsel conducted a thorough
investigation into the facts of the class action, including an extensive review of relevant
documents and data, and has diligently pursued an investigation of the putative class
members' claims against Defendants.  (Vogel Decl., ¶ 3)  Further, the Parties thoroughly
prepared for and attended four days of mediation before well-respected mediator, Louise

A. LaMothe.  It was only after those four days that the Parties reached a preliminary

agreement as to all aspects of the case.  (Vogel Decl. ¶ 19).  Since the last day of

mediation, counsel for the Parties have spent approximately 100 hours revising the

agreement and participating in follow-up discussions to finalize the details of the

Settlement Agreement.  Ms. LaMothe participated in several of these discussions.  Even

then, the final settlement terms set forth in the Settlement Agreement were not agreed

upon until another 7 hours had been spent in further face to face negotiations.  *Id.*

Given the above, the Court should approve the settlement because "[t]here is []

every reason to conclude that settlement negotiations were vigorously conducted at arms'

length and without any suggestion of undue influence."  *In re Wash. Public Power Supply

System Sec. Litig.*, 720 F. Supp. 1379, 1392 (D. Az. 1989).

**B.    The Settlement Has No "Obvious Deficiencies" and Falls Within the

Range for Approval.**

The proposed settlement herein has no "obvious deficiencies" and is well within

the range of possible approval.  Given the extensive notice provisions which include

mailing, advertising and continuing discovery of potential class members through review

of booking records and a lengthy claims period, all ICMs will have an opportunity to

participate in the Settlement and receive payment and other relief.  As discussed below,

the payment portions of the Settlement are reasonable and fair.  In addition, the injunctive

relief measures Defendants have agreed upon will correct past and prevent future

occurrences of mistaken identity incarcerations and will provide remedies for not only

22

ICMs but others.  Thus, the primary goal of this litigation has been met.

The damages portion of the Settlement is reasonable, fair and in the best interests of the class.  Through discovery on this matter, the Parties observed that the average time a putative class member spent in jail because of a mistaken identity incarceration was three days or less.  The mistake was usually discovered and corrected at the arraignment hearing which usually occurred within 1 to 3 days of arrest.  (Vogel Decl., ¶ 14)  Given this average, the Parties agree that a reasonable amount of damages is $1,000 per day, an amount which comes within the range of statutory damages for identical or similar constitutional violations as set forth in section III(C)), par. 1 *infra.   Id.*

To determine an appropriate damages award, Class Counsel reviewed recent class action settlements involving jail inmates consisting of either strip searches, overdetention claims, or both, as follows:

*Gamino v. County of Ventura,* Case No. 02-CV:9785 (C.D. Cal.)

$250.00, $650.00 or $2300.00 or $3,000 per claimant depending on circumstances

*Craft v County of San Bernardino*, Case No. 05-CV:539 (C.D. Cal.)

$1,217.88 per claimant ($25,500,000÷20,938 claimants);

*Williams v. County of Los Angeles*, Case no. 2:97-CV-0382-CW (C.D. Cal.)

$735.09 per claimant ($27,000,000÷36,730 claimants);

*Bynum v District of Columbia*, Case No. 02-CV:956 (D.D.C. 2006)

$3,213.71 per claimant ($12,000,000÷3,734 claimants).

(Vogel Decl., ¶ 14)

Response rates to class notice in class actions involving jail inmates is generally

low. (Vogel Decl., ¶ 13). Experienced civil rights class action attorney Barrett Litt

informed Class Counsel that he experienced a response rate of 21% in recent litigation

involving jail inmates in Kern County. Mr. Litt's attached declaration describes response

rates in overdetention and strip search class actions as follows:

13.6% in *Craft v County of San Bernardino*, Case No. 05 CV:539 (C.D. Cal.);

13.3% in *Williams v. County of Los Angeles*, Case no. 2:97-CV-0382-CW (C.D. Cal.);

14.4% in *Bynum v District of Columbia*, Case No. 02 CV:956 (D.D.C. 2006).

A true and correct copy of the declaration of Barrett Litt is attached to the Declaration of

Brian A. Vogel ("Vogel Decl."), Exhibit 2. Based upon Class Counsel's response rate of

16% from a limited sample in this litigation and the information received from research

and contact with other experienced class counsel in this area, Class Counsel assumed an

estimated response rate of between 15% and 25% for his negotiations with opposing

counsel. (Vogel Decl., ¶ 13)

Given the anticipated difficulties in contacting PSCMs and an anticipated response

rate of 25% or less,[3] class counsel negotiated a damages award of $3,000 per

incarceration incident, which, in his judgment, will likely result in a greater benefit, on

average, to each qualified ICM than he or she would have received if a different measure

---

[3] Prisoner's rights class actions generally have notoriously low return rates ranging from

roughly 10% to 30%. *See, e.g. Boone v. City of Phila.* 668 F.Supp.2d 693, 703 (E.D. Pa. 2009)

(noting that 15% of class members had filed claims); *McBean v. City of New York* 233 F.R.D.

377, 382 (S.D.N.Y. 2006) (noting that 11% of class members had filed claims).

of damages was used.  (Vogel Decl., ¶ 14)

       As set forth in detail in Class Counsel's declaration, identifying and contacting the
putative class members has proven to be very difficult.  (Vogel Decl., ¶ 16)  Class
Counsel has made sincere and significant efforts to locate all of the PSCMs through
formal and informal discovery means, including issuing many third-party subpoenas and
reviewing court records and the VCIJIS system.  (Vogel Decl., ¶ 16)  He was interviewed
about the case and a lengthy newspaper article about the case was published on the front
page of the *Ventura County Star* on May 29, 2011.  He received several phone calls from
PSCMs as a result of the article.  (Vogel Decl., ¶ 15)  Class Counsel also made his best
efforts to review and analyze the information and documents gathered in order to come to
a reasonable estimate as to the actual number of class members actually existing.  Class
Counsel sent out letters and emails to Ventura County deputy public defenders and local
colleagues.  He interviewed deputy public defenders and collected their declarations
attesting to the number of times they had observed mistaken identity incarceration
incidents.  (Vogel Decl., ¶ 14)  Based upon this research, discovery and investigation,
Class Counsel estimates that the total number of mistaken identity incarceration incidents
during the Class Period to have been approximately 100.  (Vogel Decl., ¶ 14)  The parties
agree that the response rate to class notice will likely be 25% or less based on the
response rates experienced in similar cases.  (Vogel Decl., ¶ 13)  The parties used these
estimates to agree upon a damages claim limitation of 40.  (Vogel Decl., ¶ 16)  In
recognition of the difficulty encountered during the litigation in locating the class

members, the Parties have agreed to a lengthy claims period of 120 days, as well as substantial advertising, over both radio and television to ensure that sufficient notice of the Settlement is given to the class members.  (Vogel Decl., ¶ 17, SA, ¶ 51)

In addition, the Parties will continue to work together for up to 80 additional hours to identify as many class members as possible.  (SA, 5(A)  They will research VCSO records prior to and during the claims period.  Specifically, the Parties have agreed that within 30 days of the full execution of the Settlement Agreement, Class Counsel will meet with a VCSO representative for up to 40 hours to review the booking records for the individuals already identified as PCSMs.  *Id.*  Further, the Parties will work to identify all mistaken identity incarceration incidents which occurred on out of county warrants during the applicable time period.  (Vogel Decl.,¶ 17, SA, ¶ 5(A)(2)(C))

Where both sides face significant uncertainty, the attendant risks favor settlement. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).  Here, a number of defenses asserted by Defendants present serious threats to the claims of Plaintiff and the other Class Members.  There was also a significant risk that, if the Action was not settled, Plaintiff would be unable to obtain class certification and thereby not recover on behalf of anyone other than himself.  Defendants asserted various defenses which may have been difficult to overcome, including assertions that Plaintiff Charles Velasquez's claims were not typical of the class and that Plaintiff would not be able to achieve numerosity for the purposes of F.R.C.P. Rule 23(a) certification.  Even if Plaintiffs prevailed on the merits, there was a substantial risk that  a jury would award class members substantially less than

26

they would receive from the settlement, particularly those ICMs who spent two days or less in custody.

After vigorous negotiations, including the preparation and submission of mediation briefs to mediator Louise A. LaMothe, as well as a detailed analysis of the information procured through both formal and informal means, the Parties recognized the potential risks and agreed upon the Settlement.

C.    **The Settlement Does Not Improperly Grant Preferential Treatment to the Class Representative or Segments of the Class.**

The relief provided in the Settlement will benefit all Class Members equally.  The settlement does not improperly grant preferential treatment to the Class Representative or any individual segments of the Class.  Each Class Member will be entitled to payment based on the plan of allocation.  As set forth above, each ICM will receive a payment of $3,000 per Incarceration Incident.  Only if the claims of Incarceration Incidents surpass 40, which the Parties have concluded is unlikely, will the total payment fund of $120,000 be distributed on a pro rata basis, irrespective of incarceration duration.  (SA, ¶ 47(B))

The Plaintiff Representative's shall receive a one-time only lump sum total payment of $55,000.  This figure is comprised of four components as follows:

1. $ 3,000 in general (non-economic) damages for emotional distress.

2. $12,000 in reimbursement for attorney fees and costs incurred in litigating Penal Code section 851.8 petitions for factual findings of innocence and judicial clearance orders in Los Angeles and Santa Barbara Counties.

27

3. $20,000 for his past and future medical and psychiatric treatment.

4. $20,000 for his role as Plaintiff representative.

Mr. Velasquez will not receive any money from the class settlement fund.  (SA, ¶ 47 (A))

Plaintiff Representative's service fee is reasonable, especially in light of the facts that he

responded to written discovery, was deposed for a full day, attended four all-day

mediation sessions, and served as the public representative of the class in a front-page

newspaper article in the local paper.  Furthermore, he incurred substantial attorney's fees

and medical and psychological treatment costs which are unlikely to have been incurred

by most class members as a result of his Incarceration Incident.  If additional class

members did incur these types of substantial, additional damages, they are free to opt out

of the Settlement.

**D.     The Stage of the Proceedings Is Sufficiently Advanced to Permit**

**Preliminary Approval of the Settlement.**

The stage of the proceedings at which this settlement was reached also militates in

favor of preliminary approval and ultimately, final approval of the settlement.  As set

forth above, Class Counsel has conducted a thorough investigation into the facts of the

class action.  Class Counsel began investigating the Class Members' claims before this

Action was filed.  The Parties engaged in meaningful and thorough discovery which

included formal written discovery, third-party subpoenas and Plaintiff's deposition.  Class

Counsel engaged in an extensive review and analysis of the relevant documents and data.

Accordingly, the agreement to settle did not occur until Class Counsel possessed

1  sufficient information to make an informed judgment regarding the likelihood of success

2  on the merits and the results that could be obtained through further litigation and trial.

3  (Vogel Decl. ¶ 20)

4

5  ## VI. CONDITIONAL CERTIFICATION IS PROPER.

6      In order to approve this settlement, the Court must determine that the settlement

7  class satisfies the requirements of *Fed. R. Civ. P.* Rule 23 (a) and at least one of the Rule

8  23(b) requirements.  Here, the settlement meets all of the above criteria.  Defendants do

9

10  not oppose conditional certification for the purposes of approval of the Settlement herein.

11  (SA, ¶ 21)

12

13  ### A.    Plaintiff Satisfies the Requirements of Rule 23(a).

14      Under Rule 23(a), the party seeking class certification must establish: (1) that the

15  class is so large that joinder of all members is impracticable (numerosity); (2) that there

16  are one or more questions of law or fact common to the class (commonality); (3) that the

17

18  named parties' claims are typical of the class (typicality); and (4) that the class

19  representatives will fairly and adequately protect the interests of other members of the

20

21  class (adequacy of representation).  *Fed. R. Civ. P.* Rule 23(a).

22      **Numerosity**: The proposed class is sufficiently numerous that joinder is

23  impracticable.  Classes consisting of forty or more persons "should have a reasonable

24

25  chance of success on the basis of number alone." 3 *Newberg on Class Actions*, § 3:5.

26  Here, based upon conclusions drawn from substantial discovery materials and anecdotal

27  evidence, Class Counsel estimates that the total number of class members with at least

28

29

one Incarceration Incident is approximately 100, which satisfies the Rule 23(a)

numerosity requirements.

  **Commonality**:  To fulfill the commonality prerequisite of Rule 23(a)(2), Plaintiff must establish that there are questions of law or fact common to the class as a whole. *Fed. R. Civ. P.* 23(a)(2).  The commonality requirements serves the dual purposes of promoting: (1) fair and adequate representation of the interests of absentee class members; and (2) practical, efficient case management.  *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 157, n. 13, 102 S.Ct. 2364, 72 L.Ed. 2d 740 (1982).  Rule 23(a)(2) does not mandate that each member of the class be identically situated. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).  Rather, the rule merely requires that a single common significant thread of law or fact run throughout all of the claims.  See *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 914 (9th Cir. 1964).  The "common question" requirement can be satisfied either by a shared legal issue with divergent factual predicates or a common core of salient facts with disparate legal remedies.  *Hanlon, supra,* 150 F.3d at 1019.  Here, there are numerous common questions of law and fact which satisfy Rule 23(a)(2), including:

- Common policies and practices regarding booking and classifying arrestees.
- Common failure to use readily available means to identify someone who makes a claim of mistaken identification.
- Common means of identification available to Defendants to investigate claims of wrong defendant status.

30

- Common causes of action for civil rights violations.

- Common failure to train and supervise Defendants' personnel in the manner of handling claims of misidentification.

- Common result of detention and incarceration due to Defendants' failure to respond to claims of wrong defendant status.

**Typicality**: Under Rule 23(a)(3), the claims of the representative plaintiff must be typical of the claims of the class. *Fed. R. Civ. P.* 23(a)(3). Typicality focuses on the similarity between the named plaintiffs' legal and remedial theories and the legal and remedial theories of those whom they purport to represent. *Lightbourn v. County of El Paso, Texas,* 118 F.3d 421, 426 (5th Cir. 1998). "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Id.* Typicality is met if other members have suffered similar injuries resulting from the same course of conduct and if the action is not based on conduct unique to the class representative. See *Jordan v. Count of Los Angeles,* 669 F.2d 1311, 1321 (9th Cir. 1982). The Ninth Circuit has held that a class representative's claims meet the typicality requirement if they are reasonably co-extensive with those of the class; the facts and legal theories need not be identical. *Hanlon, supra,* 150 F.3d at 1019-1020. Because typicality does not require that the class representative's claims be identical to those of class members, differences in damages will not destroy typicality. See *Parra v. Bashas' Inc.*, 536 F.3d 975, 978-979 (9th Cir. 2008) (observing that difficulties in the calculation of damages, as they affect the various class members, do not preclude a

finding of commonality).  Thus, a plaintiff's claim is typical if it: (a) arises from the same event or practice or course of conduct which gives rise to the claims of other class members; and (b) is based on the same legal theory as their claims.  *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985).

Here, Plaintiff Velasquez's claims are typical of the class members.  He was wrongfully booked pursuant to a warrant for another person and then wrongfully detained and incarcerated as a result of the County of Ventura and VCSO's failure to verify Velasquez's identity as not being Gonzalez's, during the time period of December 30, 2008 until the present.

**Adequacy of Representation**:  The last procedural requirement under Rule 23(a) is that the representative parties must fairly and adequately advance and protect the legal rights of absent class members.  *Fed. R. Civ. P*. 23(a)(4).  The requirement of adequate representation has two components.  *Lerwill v. Inflight Motion Pictures. Inc.*, 582 F.2d 507, 512 (9th Cir. 1978).  First, the Court must determine whether the representative plaintiffs and their counsel have any conflicts of interest with other class members.  *Id*. Second, the court must satisfy itself that the representative plaintiffs and their counsel will prosecute the action fairly, vigorously, and competently on behalf of the class.  *Id*.  "[T]he adequacy of representation inquiry focuses on the potential for conflicts of interest between class representatives and counsel, on the one hand, and absent members of the class on the other."  See *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998).

32

As noted above,  Plaintiff Velasquez's interests are not antagonistic to the class. Further, throughout the litigation, Plaintiff Velasquez has demonstrated that he is ready and willing to prosecute his claims and the class claims vigorously.  He responded to written discovery, was deposed, and attended all four days of mediation.

Rule 23(g)(1)(C)(I) states that in appointing class counsel, the court must consider: the work counsel has done in identifying or investigating potential claims in the action; counsel's experience in handling class actions and other complex litigation and claims of the type asserted in the action; counsel's knowledge of the applicable law; and the resources counsel will commit to representing the class.  Furthermore, where attorneys have been found to be adequate in the past, it is persuasive evidence that they will be adequate again.  *Hanlon, supra,* 150 F.3d at 1021 (affirming finding of adequacy of counsel based on "[a]ffidavits submitted...show[ing counsel's] experience prosecuting dozens of high profile class action cases.").

As detailed in his supporting declaration, Brian A. Vogel is a highly skilled attorney with many years experience in criminal and civil law.  He is competent to represent the interests of the class.  In addition, Mr. Vogel associated counsel, Heather A. Quest, Esq. to provide additional class action expertise in pursuit of this litigation.  Ms. Quest has substantial experience litigating plaintiffs' wage and hour class actions. (Vogel, Decl. ¶ 29)  It is clear that Plaintiff's counsel has done substantial work in identifying or investigating potential claims in the action and, likewise, has committed significant resources to representing Plaintiff and the class.

33

**B.     Certification Under Rule 23(b)(2) is Appropriate.**

Plaintiffs move for class certification under Rule 23(b)(2), which is satisfied when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . ." *Fed. R. Civ. P.* 23(b)(2).  Suits brought to vindicate civil rights are a paradigm of the type of suits for which Rule 23(b)(2) was designed.  See e.g., *Comer v. Cisneros*, 37 F.3d. 775, 796 (2d Cir. 1994) and *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1155 (11th Cir. 1983) ("Subsection (b)(2) was 'intended primarily to facilitate civil rights class actions, where the class representatives sought broad injunctive relief against discriminatory practices.'").

Here, the conduct at issue was a failure which applied across the board to every individual who had the misfortune of being booked into a Ventura County jail facility because he or she was mistakenly believed to be the subject of an arrest warrant.  The propriety of final injunctive relief or corresponding declaratory relief with respect to the class as a whole is demonstrated by the fact that the Parties have agreed in the Settlement Agreement, to implement injunctive relief measures which will allow the class to clear their record of arrest and will remedy the problem of mistaken identity incarceration incidents in the future.

Plaintiff has demonstrated that Defendants' alleged conduct is applicable to the proposed class, thereby making declaratory and injunctive relief appropriate as to the class as a whole.  Plaintiffs have satisfied Rule 23(b)(2).

34

C.      **Certification Under Rule 23(b)(3) is Also Appropriate.**

1.      **Common Issues Predominate.**

The ultimate question before the court in a certification motion is whether the common issues in this case are so numerous or substantial, as opposed to those requiring separate adjudication, that the maintenance of a class action would be advantageous to the litigants and the courts.  The first issue of predominance tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.  *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir.2001).

In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between common and individual issues.  When common questions present a significant aspect of the case and can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis.  *Id.*  Whether judicial economy will be served in a particular case turns on close scrutiny of "the relationship between the common and individual issues."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998).  Moreover, "in order to determine predominance, the Court looks to whether the focus of the proposed class action will be on the words and conduct of the defendants rather than on the behavior of the individual class members."  *Thomas & Thomas Rodmakers Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 165 (C.D. Cal. 2002).  The notion that the adjudication

35

of common issues will help achieve judicial economy is an integral part of the predominance test. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir.2001).

Finally, individualized damages do not defeat class certification when there are other central issues that are common to the class. *Multi-Ethnic Immigrant Workers Organizing Network v. City of Los Angeles* (C.D. Cal. 2007) 246 F.R.D. 621,634 (citing *Local Joint Executive Bd. Of Culinary/Bartender Trust Fund v. Las Vegas Sands. Inc.* (9th Cir. 2001) 244 F.3d 1152,1163.)

Here, it is clear that common issues predominate. Defendants, prior to entering into the Settlement Agreement, did not have a robust policy or practice in place to ensure that individuals were not wrongfully incarcerated due to mistaken identifications of warrant arrestees even though such arrests had been a recurring problem for years. Further, they did not have any policy in place which required mandatory investigation of complaints of mistaken identification in arrest warrant cases. They also had no policy or procedure in place to track these incidents or prevent recurrent arrests based upon he same mistake. The effects of Defendants' lack of having adequate practices and procedures regarding mistaken identity incarceration incidents applied equally and commonly to all individuals who were subjected to an Incarceration Incident during the Class period. Given this, common issues predominate.

### 2.    A Class Action Is Superior To Other Available Methods.

The Supreme Court has stressed that "the class action device saves the resources of

36

both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23." *Califano v. Yamaski,* 442 U.S. 682, 700-701 (1979).  The Ninth Circuit has long recognized that "where class-wide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation." *Valentino v. Carter-Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir. 1996).  Here, the class action mechanism is superior because it is more efficient and economical than litigating these individuals claims separately.  The factual and legal issues are clearly common, the class size is small enough to be manageable but large enough to make individual litigation unnecessarily time consuming.  Further, the class members' individual claims are likely to be monetarily small.  Finally, effective injunctive relief on a class-wide basis is not only necessary in this matter, but is possible and easily instituted.

> ### 3.   The Class As Defined is Manageable and Notice Can Be Provided.

To be manageable, the membership of the class needs to be sufficiently well-defined at the outset (although all members do not need to be known) to permit meaningful notice to be given. *Fed. R. Civ. P.* Rule 23(c)(2). It is also necessary that the court, at the time of judgment, be able to identify the members of the class in order to determine who will be entitled to relief and bound by the final judgment. *Manual for Complex Litigation,* Third, § 30.14; *Davoll v. Webb* (DCO 1995) 160 F.R.D. 142, 144. Here, as set forth above, the class is well-defined and manageable.  Also, as already

discussed, the Parties have already and are still making great efforts to ensure that all potential class members are identified and are given sufficient notice of the Settlement.

## VII. THE PROPOSED METHOD OF CLASS NOTICE IS APPROPRIATE

The proposed method of Class Notice in the Settlement Agreement is appropriate. "For any class certified under Rule 12(b)(3), the court must direct to Class Members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Fed. R. Civ. P.* Rule 23(c)(2)(B). "The court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal or compromise." F.R.C.P. 23(e)(1).

The Parties have agreed upon procedures by which the Class will be provided with written notice of the Settlement similar to that approved and utilized in hundreds of class action settlements. The Parties have jointly drafted a Potential Settlement Class Member Letter (SA ¶ 34, Ex O), Notice of Class Action, Proposed Class Settlement and Hearing ("Notice") (SA ¶ 34, Exs. I and J)), a Proof of Claim and Release Form (SA ¶ 34, Ex. N), and an Opt-Out Form (SA ¶ 34, Ex. P). These documents are collectively called the "Notice Packet" and will be made available in both English and Spanish. The Parties have agreed that the Administrator shall be the County of Ventura. Defendants will pay for all costs associated with the Claims Administration of the Settlement. (SA, ¶¶ 1, 31 and 47)

The proposed Notice meets all the requirements of Rule 23(c)(2)(B) because it

38

describes the nature of the action, the definition of the settlement class, the claims and

defenses at issue, and the binding effect of the class judgment.  The proposed Notice

further explains the claims process and the ability and procedure for individuals to either

opt-out of the settlement or object to it.

      The Administrator will mail individual Notice Packets to PCSMs and ICMs via

first-class regular U.S. mail to the last known addresses taken from the individuals'

booking records, unless Class Counsel provides an alternative address in writing within

10 calendar days of the completion of the SAD.  (SA, ¶ 49)  The Administrator will mail

individual Notice Packets to PCSMs and ICMs within 30 days after the "Settlement

Agreement Database" is completed, and no more than 90 days after preliminary approval

of the settlement.  (SA, ¶ 5(C))  The Administrator will complete the mailing within three

consecutive business days.  (SA, ¶ 50)  In addition, the Administrator shall provide Class

Counsel with Notice Packets to copy and provide to persons seeking claim forms directly

from him.  (SA, ¶ 49)

      The Parties have agreed that the individuals who will receive Notice Packets from

the Administrator shall primarily be those included in the "Settlement Agreement

Database" which shall be provided to the Administrator 30 days prior to the mailing of

the Notice Packets.  (SA, ¶ 5)  In addition to mailing the Notice Packets, the

Administrator will publish Class Notice on television, radio, in a local newspaper and on

the internet.

      The Notice states that ICMs who wish to participate in the Settlement shall

39

complete and return the Proof of Claim and Release Form pursuant to the instructions contained therein by mail by the "Bar Date" which is 120 days after the first day that the Administrator mails the Notice Packets.  (SA, ¶¶ 7 and 50, 53, Exs. I and J).  The Notice also provides that any Class Member may choose to opt-out of the Settlement.  Any person who chooses to opt-out of the Settlement will not be entitled to any recovery obtained by way of the Settlement.  He or she will not be bound by the Settlement or have any right to object, appeal or comment thereon.  The Notice will further provide that to opt-out of the Settlement, an ICM must mail the opt-out Form to the Administrator by the Bar Date.  (SA, ¶¶  63 and 66, Exs. I, J and P))  Any ICM who does not opt-out as set forth in the Settlement Agreement, shall be deemed conclusively to have become an ICM and to be bound by the Settlement Agreement and all subsequent proceedings, orders and judgments herein.  (SA, ¶ 65)  The Notice will further provide that all objections to the Settlement by anyone, including members of the Class, must be filed in the District Court and served upon all counsel of record by no later than the Bar Date.  (SA, ¶ 8,  Exs. I and J)

Consequently, the procedures described above are the "best notice that is practicable under the circumstances," and the Parties request the Court approve of the proposed notice procedures and documents.

## VIII. CONCLUSION

Counsel for the Parties have committed substantial amounts of time, energy, and resources litigating and ultimately resolving this case.  In the judgment of Plaintiff and

40

1  Class Counsel, the proposed settlement is a fair and reasonable compromise of the issues

2  in dispute in light of the strengths and weaknesses of each party's case.  After weighing

3  the substantial, certain and immediate benefits of this resolution against the uncertainty of

4  trial, and appeal, the Parties and their counsel believe the proposed settlement is fair,

5  reasonable and adequate, and warrants this Court's preliminary approval.

6          Accordingly, Plaintiff respectfully requests that the Court; (1) preliminarily

7  approve the proposed Settlement; (2) certify the Class for settlement purposes; (3)

8  schedule a date for a hearing on Final Approval; and (4) sign the proposed Preliminary

9  Approval Order submitted herewith.

10  Dated: September 20, 2011          THE LAW OFFICES OF BRIAN A. VOGEL, PC

11

12

13          By: _Brian Vogel_

14          BRIAN A. VOGEL
            Attorney for Plaintiff Charles Velasquez

15  Dated: September 20, 2011          WISOTSKY, PROCTOR & SHYER

16

17

18          By: _Jeffrey Held_

19          JEFFREY HELD
            Attorney for Defendants the County of Ventura, the
            Ventura County Sheriff's Department, Former Ventura
            County Sheriff Bob Brooks

20

21

22

23

24

25

26

27

28

41